IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

AUGUSTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 117-034 |
| | ) | |
| REALITY LEIGH WINNER | ) | |

**O R D E R**

In consideration of the legal briefs, oral argument, and testimony at the second detention hearing last Friday, September 29, 2017, the Court **DENIES** Defendant's motion for release from custody (doc. no. 96) and **FINDS** (1) by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of the community; and (2) by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of Defendant as required.

**I.      Overview of Bail Reform Act**

The Bail Reform Act of 1984 ("Act") mandates the pretrial release of a defendant unless the government carries its burden of proving there is no bond condition or combination of conditions that would "reasonably assure" the defendant's appearance in court or the safety of the community. 18 U.S.C. § 3142(c), (f). There is no statutory presumption of detention arising from the nature of the charge against Defendant. See 18 U.S.C. § 3142(e)(2). The government's burden with respect to dangerousness is by clear and convincing evidence and the government's burden as to appearance in court is by a preponderance of the evidence. United States v. Quartermaine, 913 F.2d 910, 917 (11th Cir.

1990); 18 U.S.C. § 3142(f)(2). "The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f)(2).

The Act specifies the factors considered in determining whether there are conditions to reasonably assure safety and appearance as (1) the nature and circumstances of the offense charged, including whether it is a crime of violence or terrorism, or involves a minor victim, controlled substance, firearm, or explosive device; (2) the weight of the evidence; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community posed by the defendant's release. 18 U.S.C. § 3142(g)(1)-(4). These factors weigh heavily in favor of detention, as explained below.

**II.    Discussion**

    **A.    Nature and Circumstances of the Offense Charged**

The superseding indictment alleges Defendant violated 18 U.S.C. § 793(e) by willfully transmitting classified information to an online news outlet despite knowing disclosure could cause specific, articulable, and "exceptionally grave damage to the national security . . . ." (Superseding Indict., doc. no. 72, ¶ 3.) The nature and circumstances of the offense weigh in favor of detention because of the ongoing risk to national security posed by releasing Defendant in light of her alleged criminal disclosure and the potential for additional disclosures given her access to a wealth of classified information during her service in the Air Force and with NSA.

Defendant argues the nature of this case weighs against detention because complexities necessitated pushing the trial date back to March of next year. As the Eleventh Circuit has previously explained, "the prospect of eight to ten months of pretrial detention,

without more, does not mandate the release of a defendant for whom pretrial detention is otherwise appropriate." Quartermaine, 913 F.2d at 918. This is particularly true here since Defendant requested the delay in trial, and the risks of flight and danger to the community are high as explained *infra*. Id.; (see doc. no. 84, Aug. 30, 2017 Status Conf. Tr. ).

The Court has also carefully considered Defendant's arguments concerning the scope of § 793(e) and finds the code section broad enough to encompass Defendant's purported conduct. Nor is the Court persuaded by Defendant's argument "the vast majority of courts have held that defendants charged with similar offenses were entitled to be released pending trial." (Doc. no. 96-1, p. 14.)   Defendant provided a chart listing thirteen cases in which courts granted pretrial release to defendants whom Defendant contends were similarly situated. (Id. at 14-20.) However, the detention analysis under the Act does not lend itself to easy comparisons across cases because of its intense focus on the unique facts of each case and the unique characteristics of each defendant.

Additionally, as the government points out, many of the cases touted by Defendant are materially distinguishable. (See doc. no. 100, pp. 9-10.) Two defendants received misdemeanor convictions and sentences of probation only. United States v. Nishimura, No. 2:15-CR-145-KJN, doc. no. 7 (E.D. Cal. Aug. 12, 2015); United States v. Patraeus, No. 3:15-cr-47-DCK, doc. no. 24 (W.D.N.C. Apr. 29, 2015). Two other defendants entered plea agreements within days of their initial charges, and one received a sentence of probation on a misdemeanor conviction. United States v. Leibowitz, No. 8:09-cr-632, doc. no. 25 (D. Md. May 25, 2010) (twenty months of imprisonment); United States v. Berger, No. 1:05-MJ-175-DAR, doc. no. 17 (D.D.C. Sept. 13, 2005) (two years of probation for plea to misdemeanor charge).

3

### B. Weight of the Evidence

For purposes of this detention analysis only, the Court finds at this early stage of the case that the evidence against Defendant is strong. During her initial interview with law enforcement, Defendant admitted she leaked classified information to a news outlet. Defendant also made damning admissions regarding the same in recorded jail phone conversations with her mother and sister. Gov't Exs. 3, 6; (doc. no. 96-2, p. 2). The circumstantial evidence corroborates Defendant's admissions. FBI Special Agent Justin Garrick testified (1) Defendant was one of six NSA workers who accessed the leaked document; (2) Defendant was one of two NSA workers who printed the leaked document; (3) Defendant was the only NSA worker for which there is proof of contact with the news outlet during the period of time when the leak occurred; and (4) the leaked document was mailed from Augusta, Georgia to the news outlet one day after Defendant printed it. See also Gov't Ex. 3. Defendant further admitted she knew the document contained information regarding sources and methods of collecting classified information that would be valuable to adversaries of the United States. Id. at USAO 08172-08173.

### C. History and Characteristics of the Person

When considering the history and characteristics of a person in the context of determining pretrial detention, courts consider the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, record concerning appearance at court proceedings, and whether at the time of the current offense or arrest the person was on a conditional release. See 18 U.S.C. § 3142(g)(3).

Characteristics weighing in favor of Defendant's pretrial release are her service in the Air Force, clean criminal history, and loving and committed parents. Substantially outweighing these positive characteristics, however, are Defendant's state of mind, short length of time residing in the community, few community ties, and past conduct. Indeed, the Court finds, based on compelling evidence presented by the government, that Defendant admittedly "hates" America, misused a top-secret computer during her Air Force career, admires Edward Snowden and Julian Assange, and began preparations to leak classified information from the very outset of her work as an NSA subcontractor.

First, one need look no further than Defendant's own writings to surmise that she hates the United States and has plotted against the government. On February 25, 2017, during training for her new NSA job, Defendant wrote her sister that she would fail a polygraph because of questions concerning whether she had ever plotted against the United States Government. Gov't Ex. 11. On the same day, Defendant wrote her sister she hated America. Id. When her sister responded with incredulity, Defendant proclaimed again she hated America and explained she feels this way because America is "literally the worst thing to happen to the planet." Id.

Second, Defendant admittedly misused a top-secret computer during her service with the Air Force. On November 9, 2016, approximately one month before her discharge, Defendant searched the Internet to determine whether it is possible to insert a thumb drive into a top-secret computer without being detected. Gov't Ex. 3, USAO 08144, 08170-08171; (doc. no. 29, p. 21). On the same day as the Internet search, Defendant did insert a thumb drive into a top-secret computer for two minutes. Gov't Ex. 3, USAO 08170-08171. The

5

government has been unable to determine why Defendant inserted the thumb drive, whether she saved anything to the thumb drive, or where the thumb drive is located today.

Third, Defendant admittedly admires Edward Snowden and Julian Assange. On February 9, 2017, Defendant messaged her sister through Facebook it was "hard not to laugh" when an NSA security officer emphasized during training the enormity of the security threat posed by insiders such as Edward Snowden. Gov't Exs. 9, 11. On March 7, 2017, in Facebook messages with her sister, Defendant lauded a recent Wikileaks cache of classified information as "awesome" because it "crippled" a government program, and explained to her sister she is on the side of Assange and Snowden. Gov't Ex. 12.

Fourth, Defendant made an extended effort to develop stealth Internet capabilities during the same time period she began her employment as an NSA subcontractor. Defendant's first day working as an NSA subcontractor was February 9, 2017. Just days before starting her NSA job, Defendant downloaded a Tor browser that allows anonymous Internet operations. In the following weeks, Defendant researched how to send information anonymously to news outlets, attempted to set up a single-use email account for anonymous email, and researched how to unlock her cell phone and use it anonymously. (See doc. no. 100, pp. 19-20.) Viewed in totality, SA Garrick described these activities as preparation of a "covert communications package." The timing strongly suggests Defendant was planning to leak classified information from the outset of her NSA employment, while all the while swearing allegiance to the United States and promising to safeguard its national secrets.

D.  **Nature and Seriousness of Danger to Community**

As the Eleventh Circuit has explained, "[t]he term 'dangerousness,' as used in the Bail Reform Act of 1984, has a much broader construction than might be commonly

6

understood in everyday parlance." United States v. King, 849 F.2d 485, 487 n.2 (11th Cir. 1988). Indeed, the Act broadly references the safety of any person and the safety of the community at large. While the primary focus of the former is the risk of physical violence toward a particular person such as a victim or witness, the latter refers to any risk a defendant may pose to the well-being of a community. Id. Examples include the potential corruption of a union or the obvious perils drug trafficking poses to a community. Id.

By her own words and actions, Defendant has painted a disturbing self-portrait of an American with years of national service and access to classified information who hates the United States and desires to damage national security on the same scale as Julian Assange and Edward Snowden. The nature and seriousness of the danger she poses to our nation is high.

E. **Risk of Flight**

Defendant has few ties to Augusta, Georgia, and her desire to live abroad is understandably strong given her intense dislike for the United States. Fluent in Farsi, Dari, and Pashto, Defendant described her "big plan" to SA Garrick as deploying to Afghanistan as a Pashto linguist. Gov't Ex. 3, USAO 08124-08125, 08139. Defendant further explained she left the Air Force and took the NSA job in Augusta to regain her clearance in the hopes of getting a deployment. Id. at 08174. SA Garrick testified that, as Defendant's time with the Air Force came to a close in October and November 2016, she scoured the Internet for airline tickets, jobs, and housing in places such as Kurdistan, Iraq, Afghanistan, and Jordan. See also Gov't Ex. 8. The incentive to relocate overseas has to be no less tempting now that a grand jury has charged her with a felony offense carrying a maximum penalty of ten years in prison.

The risk of flight is also heightened because Defendant has the financial means to flee the country, as evidenced by her solo, three-day trip to Belize over the 2017 Memorial Day weekend, during which she flew to Belize Saturday morning and flew back to Georgia Monday morning. Gov't Ex. 3, USAO 08149-08150. While Defendant has surrendered her passport and cannot obtain another one in her own name, this obstacle provides little assurance given her self-described desire to "burn the White house down" and "[f]ind somewhere in Kurdistan to live . . . or Nepal." Gov't Ex. 7.

### III. Conclusion

The Court **DENIES** Defendant's motion for release from custody. (Doc. no. 96.) Defendant shall remain in the custody of the Attorney General or his designated representative for confinement pursuant to the terms of the Court's first Detention Order entered June 9, 2017. (Doc. no. 27.)

SO ORDERED this 5th day of October, 2017, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA