No. 17-15458

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

UNITED STATES,

*Plaintiff-Appellee*,

v.

REALITY LEIGH WINNER,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Southern District of Georgia
No. 12-cv-03032 (Hon. Randall Hall)

## MOTION FOR RELEASE BEFORE JUDGMENT OF CONVICTION

/s/ Joe D. Whitley
Joe D. Whitley
Georgia State Bar No. 756150
**BAKER, DONELSON, BEARMAN,
    CALDWELL & BERKOWITZ, P.C.**
3414 Peachtree Rd. NE, Suite 1600
Atlanta, Georgia 30326
Tel:  (404) 577-6000
JWhitley@bakerdonelson.com

*United States v. Winner*, No. 17-15458

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Eleventh Circuit Rule 26.1-1, the undersigned counsel for

Defendant-Appellant Reality Leigh Winner hereby certifies that the following

persons and entities have an interest in the outcome of this case:

Epps, Brian K., U.S. Magistrate Judge

First Look Media

Hall, Randall, U.S. District Judge

United States Department of Justice

Winner, Reality Leigh

Respectfully submitted,

/s/ Joe D. Whitley
Joe D. Whitley
Georgia State Bar No. 756150

Counsel for Defendant-Appellant

Pursuant to 18 U.S.C. § 3145(c), Federal Rules of Appellate Procedure 9(a) and 27, and Eleventh Circuit Rule 9-1, Defendant-Appellant Reality Leigh Winner appeals the pretrial order of the district court (attached) detaining her without bail.

## INTRODUCTION

This case cries out for correction. Since June, Reality Winner has been detained on a one-count indictment under 18 U.S.C. § 793(e) for allegedly disclosing one classified document to a news outlet. At the time of her arrest, she was 25 years old and had no criminal history. She had moved to Augusta, Georgia after being honorably discharged from the Air Force, where she used her linguistic skills in the fight against terrorism. While working as an NSA contractor, she taught yoga and spin classes and volunteered at an animal shelter.

. Like many other Americans, Ms. Winner may have been swept up in political fervor surrounding the 2016 presidential election. In May, after hearing persistent public denials by the President ███████████████████████, Ms. Winner's frustrations purportedly boiled over. In what appears to be an ill-advised, amateurish stunt, she allegedly disclosed one document, one time, to one domestic news source. The document purportedly contained ███████████

███████████████████████████████████████████████

███████████████████

Ms. Winner's months-long detention without bail is baseless and unprecedented. The Bail Reform Act authorizes pretrial detention only where the defendant presents a serious risk of flight or—in cases involving enumerated serious crimes—a danger to the community. All agree that § 793(e) is not one of those enumerated crimes. Flight risk is therefore the only valid basis for detention, as every court of appeals to consider the question has concluded.

The district court agreed with this analysis. Yet it improperly considered dangerousness at every turn—under the wrong standard of proof, no less—and concluded based on little more than speculation that Ms. Winner will improperly disclose information if released. This was error. Moreover, the court's portrait of Ms. Winner does not accord with reality. There is no danger of further disclosure. She is no spy; she is an idealistic young veteran who allegedly found an unfortunate, one-time outlet for her political frustrations.

Under the correct standard, pretrial detention is unwarranted. Ms. Winner is no flight risk; she has strong ties to her family and the community, has no criminal record or history of evading justice, and has consented to any condition of release this Court might impose. Given the constraints imposed by classified evidence, moreover, her continued detention is severely compromising her ability to prepare her defense. Nearly every other defendant charged under § 793(e) has been released pretrial. So should she.

2

## BACKGROUND

### A.    Facts

Reality Winner, 26, was born and raised in Texas and graduated from high school in the top ten in her class. R.29 at 36:10. She turned down a full engineering scholarship to Texas A&M, instead enlisting in the Air Force, where during six years of service she received high evaluations and a commendation. R.97 ¶ 4. Ms. Winner attended the Defense Language Institute, obtaining an associate's degree in Persian-Farsi and Dari. *Id.* ¶ 5. Today, Ms. Winner is fluent in Farsi, Dari, and Pashto, languages that the U.S. government needed for its intelligence and counter-terrorism efforts. *Id.* She also served for six months at the NSA in Augusta, Georgia. *Id.* ¶ 6. Ms. Winner has never served or lived abroad. She has no criminal history.

Upon being honorably discharged in December 2016, Ms. Winner returned to Augusta, where she became a contractor for Pluribus International Corporation. *Id.* ¶ 7. Ms. Winner already has strong connections to the Augusta community and a network of friends and colleagues. An environmentalist and vegan, Ms. Winner taught yoga and spin classes and volunteered at the local animal shelter. *Id.* ¶ 10, 12; R.120 at 100:22-102:2. Ms. Winner hopes to use her language skills to provide international humanitarian aid. *Id.* at 98:18-99:1.

On June 3, 2017, ten armed male FBI agents appeared at Ms. Winner's home with a search warrant for her house, car, and person. R.97 ¶ 3. In response to questioning, Ms. Winner told two agents that she had printed an intelligence report, taken it from the office, and mailed it to a news outlet.[1] R.100, Ex. A, USAO-08152-53, 08161-62. Ms. Winner was arrested and taken to jail, where she has remained ever since. R.64 ¶ 21; R.97 ¶ 3.

### B.    Procedural History

The Government charged Ms. Winner with one count of violating 18 U.S.C. § 793(e). Ms. Winner allegedly "printed and improperly removed classified intelligence reporting, which contained classified National Defense Information … from an Intelligence Community Agency" and "unlawfully transmitted the intelligence reporting to an online news outlet." R.13 ¶¶ 11, 13. The document allegedly "describes intelligence activities by a foreign government directed at targets within the United States." *Id.* ¶ 11.

After a hearing, the magistrate judge ordered Ms. Winner detained pending trial based on both flight risk and dangerousness to the community. R.27. When the Government retracted several key factual assertions, Ms. Winner moved to reopen the detention hearing. R.96-1, at 6-11. After doing so, the magistrate judge again ordered Ms. Winner detained. R.115.

---

[1] Ms. Winner has moved to suppress these statements. R.63.

Ms. Winner appealed to the district court, which affirmed on November 27, 2017.  R.163.  Although the district court stated that the only basis for a hearing was risk of flight, it nonetheless considered dangerousness, finding a risk Ms. Winner would make additional disclosures.  *Id.*

Ms. Winner filed a notice of appeal on December 11, 2017.  Trial is set for March 19, 2018.  R.66.

## STANDARD OF REVIEW

This Court reviews questions of law, including the interpretation of statutes, de novo.  *United States v. Allen*, 190 F.3d 1208, 1210 (11th Cir. 1999).  A pretrial detention order under the Bail Reform Act of 1984 (the "Act") "present[s] mixed questions of law and fact to be accorded plenary review on appeal."  *United States v. Hurtado*, 779 F.2d 1467, 1471-72 (11th Cir. 1985).  "[P]urely factual findings" are reviewed for clear error.  *Id.* at 1472.

## ARGUMENT

## I.   Ms. Winner Is Entitled to Release Because the Government Has Not Shown a Serious Risk of Flight

### A.   Flight Risk Is the Only Permissible Basis for Detention Here

Before 1984, federal defendants in noncapital cases were entitled to pretrial release unless the Government demonstrated a risk of flight.  *See United States v. Himler*, 797 F.2d 156, 158-59 (3d Cir. 1986).  The Act effected a "radical departure from former federal bail policy" in noncapital cases by adding

dangerousness as another basis for detention. *Id.* at 158. To constrain that new authority, however, Congress "carefully limit[ed] the circumstances under which detention may be sought [based on dangerousness] to the most serious of crimes." *United States v. Salerno*, 481 U.S. 739, 747 (1987).

The Act provides that a court "shall order the detention of [a] person before trial" if it "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). A court may order detention, however, only "after a hearing pursuant to the provisions of subsection (f) of this section." *Id.* Under § 3142(f)(1), the court may hold a hearing if the case involves (A) a crime of violence, (B) an offense with a maximum punishment of life imprisonment or death, (C) a serious narcotics offense, (D) a felony for certain recidivists, or (E) certain felonies involving minors. None of those offenses is charged here. Under § 3142(f)(2), the court also may hold a hearing if the case "involves … a serious risk that [the defendant] will flee" or "a serious risk that [the defendant] will obstruct or attempt to obstruct justice."

All five courts of appeals to address the question have concluded that where, as here, a court holds a detention hearing based solely on the risk of flight under § 3142(f)(2), the court may order detention *solely* on that basis. The Third Circuit, for example, has held that, where the crime charged is not listed in subsection

6

(f)(1), "the statute does not authorize the detention of the defendant based on danger to the community." *Himler*, 797 F.2d at 160. Instead, the defendant "may be detained only if the record supports a finding that he presents a serious risk of flight." *Id.* The First Circuit likewise has held that "detention is based on dangerousness … can be ordered only in cases involving one of the circumstances set forth in § 3142(f)(1)." *United States v. Ploof*, 851 F.2d 7, 11 (1st Cir. 1988); *see also United States v. Byrd*, 969 F.2d 106, 110 (5th Cir. 1992); *United States v. Twine*, 344 F.3d 987, 987 (9th Cir. 2003); *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988).

Importantly, the circuits reached this consensus before Congress amended the list of crimes in § 3142(f)(1) three times in the mid-2000s. *See* Intelligence Reform & Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 6952, 118 Stat. 3638; Adam Walsh Child Protection & Safety Act of 2006, Pub. L. No. 109-248, § 216, 120 Stat. 587; William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, § 224(a), 122 Stat. 5044. "Congress's decision … to amend [the list of crimes in § 3142(f)(1)] while still adhering to the operative language [in the rest of the statute] is convincing support for the conclusion that Congress accepted and ratified the unanimous holdings of the Courts of Appeals …." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive*

*Communities Project, Inc.*, 135 S. Ct. 2507, 2520 (2015); *see also United States v. Giordano*, 370 F. Supp. 2d 1256, 1261 n.3 (S.D. Fla. 2005).

"There is no indication ... [this Court] would interpret section 3142(f) any differently." *Id.* at 1262-63. Indeed, this Court twice has affirmed pretrial detention orders based on flight risk without even mentioning dangerousness in its recitation of the factors the statute instructs courts to consider. *See United States v. Kachkar*, 701 F. App'x 744, 746 (11th Cir. 2017); *United States v. Clum*, 492 F. App'x 81, 85 (11th Cir. 2012). That indicates this Court agrees that, in risk-of-flight cases under § 3142(f)(2), dangerousness is not relevant to the decision between detention and release.

The consensus among the circuits accords with the statutory text and structure, as well as common sense. By setting forth the criteria for a detention hearing, § 3142(f) limits both the categories of cases where a hearing is authorized and the interests that can justify detention when a hearing occurs. If a court holds a hearing *only* because the case involves a serious risk of flight, common sense dictates that the court may order detention only for that reason. A court may not hold a hearing based on flight risk, but then order detention based on dangerousness.

Structurally, moreover, the statute treats dangerousness-based detention as a special category. The statute provides that a court may order detention based on

8

dangerousness only by "clear and convincing evidence." 18 U.S.C. § 3142(f). And § 3142(e)(2) creates "a rebuttable presumption ... that no condition ... will reasonably assure the safety of any other person and the community" in a subset of the cases "described in subsection (f)(1)." The statute thus directly ties dangerousness-based detention to cases under § 3142(f)(1).

The legislative history confirms the point. The Senate Committee Report repeatedly ties the cases described in § 3142(f)(1) to dangerousness. It states that those cases "comprise the greatest risk to community safety," warranting a hearing to determine whether "any form of conditional release will be adequate to address the potential danger the defendant may pose." S. Rep. No. 98-225 at 21 (1983); *see also id.* (other similar statements). When discussing cases under § 3142(f)(2), by contrast, the Report does not mention dangerousness. Rather, the Report makes clear that a court's detention authority in those cases "reflect[s] current case law." *Id.* As explained, pre-1984 practice did not permit pretrial detention based on dangerousness in noncapital cases.

The Supreme Court, too, has read the Act to limit detention based on dangerousness to cases under § 3142(f)(1). In *United States v. Salerno*, the Court upheld the statute's provisions authorizing dangerousness-based detention against challenges under the Fifth and Eighth Amendments. 481 U.S. at 755. Citing § 3142(f) and describing the crimes listed in subsection (f)(1), the Court explained

9

that the Act "carefully limits the circumstances under which detention [based on dangerousness] may be sought to the most serious of crimes." *Id.* at 747.

That interpretation was critical, moreover, to *Salerno*'s holding. The Court upheld dangerousness-based detention because the statute "operates only on individuals who have been arrested for a specific category of extremely serious offenses" and thus "narrowly focuses on a particularly acute problem in which the Government interests are overwhelming." *Id.* at 750. If that were not so, the statute's constitutionality would be dubious. And the Act "must be construed, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave doubts upon that score." *Almendarez-Torres v. United States*, 523 U.S. 224, 237 (1998) (quotation marks omitted).

## B.   The District Court Improperly Ordered Detention Based on Dangerousness

The district court addressed Ms. Winner's arguments regarding the relevance of dangerousness in a single confusing footnote. The court's clearest statement is unequivocal: "The Government cannot move for detention on the basis that Defendant poses a danger to the community under 18 U.S.C. § 3142(f)(1) because she does not meet any of the criteria set forth therein." R.163 at 2 n.2. The court confusingly added, however, that "the 'dangerousness' of this Defendant is still a factor to be considered under … § 3142(g)(4). Moreover, the 'dangerousness' of Defendant as a factor also 'emanates' from § 3142(e)(1)'s

10

requirement that the Court consider whether any condition(s) may reasonably assure the safety of the community." *Id.* (citation omitted) (quoting *United States v. King*, 849 F.2d 485, 487 (11th Cir. 1988)).

To be sure, in language paralleling § 3142(e)(1), the statute in § 3142(g)(4) directs a court to consider, among other factors, "the danger to any person or the community that would be posed by the [defendant]'s release." That directive, however, does not permit pretrial detention based on dangerousness in a case not covered by § 3142(f)(1). Just because a court must consider a factor does not mean that factor will be relevant, or relevant in the same way, in every case. In risk-of-flight cases under § 3142(f)(2), a court generally may not consider dangerousness in deciding whether to detain. Dangerousness is relevant to that decision only insofar as it suggests a risk of flight—a particularly dangerous defendant, for example, might commit a crime to facilitate his flight. *See Giordano*, 370 F. Supp. 2d at 1269-70. Beyond that, courts in cases under § 3142(f)(2) may consider dangerousness "only in setting conditions of release." *Himler*, 797 F.2d at 160.

The district court here far transgressed those limitations. The court plainly ordered detention because it believed (wrongly, *see infra* pp.20-23) that Ms. Winner poses a danger of improper disclosure.

11

The court repeatedly emphasized, for example, the "covert communications package" Ms. Winner allegedly created, which (notwithstanding Ms. Winner's offer to avoid accessing the Internet) could facilitate anonymous communication. R.163 at 5-6, 12. The court also dismissed the fact that the case involves only "one document, one time, to one recipient, with no allegations of financial gain" because "the Government caught this Defendant before any more damage could be done." *Id.* at 6 n.5. The court further noted that Ms. Winner once inserted a thumb drive into a secure computer for two minutes. *Id.* at 10 Although there is no evidence Ms. Winner downloaded any classified information, the court repeatedly stressed that the Government "has not located the thumb drive." *Id.*; *see id.* at 14 (similar).

The court also observed that Ms. Winner "researched ways to send information to news outlets anonymously and accessed classified information outside of her job duties." *Id.* at 12; *see also id.* at 10-11 (similar). In the court's view, Ms. Winner "sought out employment in a classified position with the intent to anonymously share information with news outlets and to cover her tracks while doing so." *Id.* at 13. The court noted that the Government "has not concluded that [Ms. Winner] has not had further access to classified information." *Id.* at 14. And the court found that "releasing Defendant prior to trial would pose a danger to the community, particularly to the national security." *Id.*; *see id.* at 15-16, 17 (similar). Indeed, the danger of disclosure was so central to the court's reasoning that it

12

described flight risk as an "[a]dditional[]" consideration on which the Government "presented other significant evidence." *Id.* at 14.

The court's reliance on dangerousness is perhaps clearest in its rejection of Ms. Winner's offered conditions of release. In the court's view, Ms. Winner's "promises" were insufficient because they "do not adequately protect against potential further unauthorized disclosures." *Id.* at 16. The court even invoked a precautionary principle: "Classified information cannot be retrieved or un-disclosed once it is released, so the potential of harm to national security is too great a risk to place upon the promises of this Defendant." *Id.*

That misguided reasoning is improper where Congress has determined flight risk is the only basis for depriving a citizen of her liberty before trial. The district court's error in ordering detention based on dangerousness requires reversal.

## C.    The Government Has Not Shown a Serious Risk of Flight

Detention is not necessary to ensure Ms. Winner's appearance in court. The district court found Ms. Winner posed a serious flight risk given her "desire to live abroad," her language skills, $30,000 in her bank account, and a "propensity for travel" demonstrated by a vacation to Belize over Memorial Day weekend. *Id.* at 14-15. But those facts do not distinguish Ms. Winner from millions of Americans, or from other defendants charged under § 793, nearly all of whom have been released on bail. Nor do those facts distinguish Ms. Winner from Paul Manafort

13

and Rick Gates, who were recently released despite facing charges of being unregistered foreign agents, laundering tens of millions of dollars through foreign bank accounts, and lying to investigators, even though Manafort has millions of dollars in assets and three passports with different numbers. *United States v. Manafort*, No. 1:17-cr-00201-ABJ, ECF Nos. 14, 95 (D.D.C. Dec. 15, 2017).

Each of the four factors in § 3142(g) favors release here.

### 1.    Nature and Circumstances of the Offense Alleged

The Government charged Ms. Winner with one violation of § 793(e), based on the alleged unauthorized disclosure of one document to one domestic news source. That offense does not render Ms. Winner a flight risk.

Pretrial detention under § 793(e) is rare. In case after case, courts have granted pretrial release to defendants charged with disclosing or retaining classified information—often far more information than is at issue here. *See* R.96-1 at 15-20. Below, the Government identified just one other case where a defendant charged under this statute was detained pretrial. R.131 at 11 n.4. The facts here do not remotely resemble that case, which involved a defendant who allegedly hoarded 50 terabytes of classified information over a 20-year period and had ongoing issues with mental health and alcohol abuse. *See United States v. Martin*, No. 1:17-cr-00069-MJG, ECF Nos. 21, 24 (D. Md. Oct. 21, 2016).

14

The district court here reasoned that the actual circumstances of the offense charged are "of little importance" because "the Government caught this Defendant before any more damage could be done." R.163 at 6 n.5. But the question is whether the nature and circumstances of the "offense *alleged*"—and the potential consequences of the charges—give Ms. Winner a strong "incentive" to flee. *United States v. Ellis*, 646 F. App'x 889, 890 (11th Cir. 2016) (mem.). Speculation about hypothetical offenses that Ms. Winner never committed constitutes no more than an assessment of future dangerousness, which, as demonstrated, is irrelevant in this case.

## 2. Weight of the Evidence

The weight of the evidence likewise does not suggest Ms. Winner will flee. By its terms, § 793(e) does not criminalize the disclosure of all classified information. Rather, the Government must establish beyond a reasonable doubt that Ms. Winner knowingly disclosed a document "relat[ed] to the national defense." Material "relating to the national defense" must be "potentially damaging to the United States or … useful to an enemy of the United States" *and* "closely held" by the U.S. government. *United States v. Morison*, 844 F.2d 1057, 1071-72 (4th Cir. 1988); *see also* R.132 at 3-4 (citing additional cases). Information in the public domain generally is not closely held. *See United States v. Rosen*, 445 F. Supp. 2d 602, 620-21 (E.D. Va. 2006). More than 50% of

15

classified documents do not qualify as "relat[ed] to the national defense." *See Too Many Secrets: Overclassification as a Barrier to Critical Information Sharing: Hearing Before the Subcomm. on National Security, Emerging Threats, and International Relations of the H. Comm. on Government Reform*, 108th Cong. 263 at 82-83 (2004) (testimony of J. William Leonard).

The district court brushed aside these elements, asserting that Ms. Winner's purported "admission" that she took the document out of the NSA and mailed it to a news outlet "appear[s] to hit upon all the elements of the crime." R.163 at 7. Ms. Winner has moved to suppress those statements. R.63. Regardless, nothing in the record—not Ms. Winner's purported "admission," her alleged statements to her sister that she "screwed up" and "leaked a document," or even evidence that Ms. Winner "was the source of the leaked document"—contradict the fact that the document here presented no potential damage to national security and was already in the public domain. R.163 at 7-8. Indeed, the prosecution will have difficulty proving that the information in the document is even true, let alone damaging. The President himself has repeatedly and publicly cast doubt upon it. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

The document here was not "relat[ed] to the national defense" under

§ 793(e). Far from showing a risk of flight, the weight of the evidence shows that

Ms. Winner has a strong defense, which she has every reason to appear at trial to

vindicate.

### 3.     History and Characteristics

Ms. Winner's history or characteristics demonstrate that she will appear in

court. Ms. Winner has no criminal record and no history of missing court

appearances or ignoring court orders. She has an outstanding record of academic

performance and military service, and is a talented linguist desiring to serve her

country and engage in humanitarian work. Her ties to the community in Augusta

are strong, and she has loving relationships with her family. Her mother has

already made arrangements to move to Augusta to live with her, and is willing to

post her property as bond.

There is no basis to believe Ms. Winner would abandon her family and

community. Even the magistrate judge noted, "If we were dealing with the person

Miss Winner's parents know and love, then there would be no question that she

ought to be released." R.29 at 106:23-25. Nevertheless, the district court ordered

detention based on evidence that Ms. Winner conducted Internet searches about

traveling, working, and living in various countries. R.163 at 10. But it would be

surprising if someone with Ms. Winner's language skills did *not* research those

17

things. And the other evidence the district court cited pertained to its erroneous and improper finding of dangerousness, which has no bearing on whether Ms. Winner is a flight risk. *Id.* at 10-12.

## 4. Danger Posed by Release

If Ms. Winner's "dangerousness" can be considered at all, it is relevant only to assessing flight risk or setting the conditions of her release. The district court cited no evidence—and the Government offered none—that Ms. Winner is dangerous in a way that would increase her risk of flight. And there is no basis for believing Ms. Winner would commit crimes that would enable her to flee, or that she would present a danger to society in an attempt to flee. *See Giordano*, 370 F. Supp. 2d at 1269-70.

## D. Conditions Would Reasonably Assure Ms. Winner's Appearance

A variety of conditions would reasonably assure Ms. Winner's appearance. She agreed to numerous restrictions and conditions on release, including but not limited to: (1) residing in her home with her mother as third-party custodian; (2) not traveling beyond Richmond County, Georgia without the permission of her Pretrial Services Officer and the Government; (3) not accessing the Internet or possessing any electronic device capable of doing so; (4) avoiding communication with any media outlet; (5) having regular contact with her Pretrial Services Officer; (6) wearing a monitoring bracelet; (7) surrendering her passport and not obtaining

18

a new one; and (8) her mother and step-father posting their property as a bond. R.97 ¶ 15; R.128 at 22-23.

The district court disregarded all these proposals, asserting it had "reasonably conclude[d]" that "Defendant will flee despite these conditions and assurances." R.163 at 15-16. To be sure, the court need not recite every possible condition and explain why it is inadequate. *United States v. Clum*, 492 F. App'x 81, 85 (11th Cir. 2012). But the perfunctory statement here does not withstand scrutiny. The Government presented no evidence Ms. Winner could or would flee under such restrictive conditions.

In cases involving defendants facing similar and more serious charges, other courts have found conditions far less stringent to be sufficient to reasonably assure the defendant's appearance. John Kiriakou, for example, who allegedly disclosed a CIA's officer's identity to a reporter, was released on condition, among others, that he post a $250,000 bond, remain in the D.C. metro area, surrender his passport, and report to his Pretrial Services Officer. *United States v. Kiriakou*, No. 1:12-cr-127, ECF No. 8 (E.D. Va. Jan. 23, 2012); *see also* R.96-1 at 15-20 (comparing release conditions of thirteen defendants facing similar charges). The district court gave no reason why similar restrictions would be insufficient here.

19

## II.    Even if Dangerousness Were a Valid Ground for Detention, Ms. Winner Is Entitled to Release

As explained, Ms. Winner must be released pending trial because the Government has not demonstrated she is a serious flight risk.  But even if dangerousness were relevant, detention is unwarranted.

While detention based on flight risk may be supported by a preponderance of the evidence, pretrial detention based on dangerousness must be supported by "clear and convincing evidence."  18 U.S.C. § 3142(f).  But the district court expressly found dangerousness "by a preponderance of the evidence."  R.163 at 17. That plain legal error alone requires reversal.

Regardless, the district court's conclusion is unsupported by the record.  The court found Ms. Winner poses a danger based on "uncertainty [about] Defendant's level of knowledge or possession of classified information," combined with "evidence" that she "planned to anonymously release information to online news outlets and that she has antipathy toward the United States."  R.163 at 14.  That is plainly at odds with Ms. Winner's history and characteristics.  *See* 18 U.S.C. § 3142(g)(3).  Far from being a spy, she is a young veteran whose misguided impulses and political passion allegedly led her to commit a single, isolated offense.

The district court's findings to the contrary rest on a distorted picture of Ms. Winner.  The district court referenced a note Ms. Winner wrote to herself after the

20

election stating that she "want[ed] to burn the whitehouse down. Find somewhere in Kurdistan to live … or Nepal haha maybe." R.163 at 10. But understood in context, Ms. Winner plainly was not planning to commit arson and become a fugitive. Like countless Americans who have joked about moving to Canada or elsewhere, she was expressing nothing more than deeply felt political frustration. *See, e.g.*, Meg Wagner, *The Complete Guide to Fleeing Donald Trump's America*, Daily News (Mar. 2, 2016), http://nydn.us/1LwjKWW.

The other evidence the district court cited—that Ms. Winner inserted a thumb drive into a secure computer for two minutes; researched the Taliban; took notes about a private Internet browser, burner email accounts, and SIM cards—is no more persuasive. R.163 at 10-12. The Taliban is a matter of public concern relevant to Ms. Winner's occupation, and there is nothing suspicious about protecting one's privacy. The district court also emphasized that Ms. Winner said she "hate[d] America." *Id.* at 12. But Ms. Winner does not actually hate America—she was simply upset by the country's face after the 2016 election. Similarly, Ms. Winner's various statements to her sister on Facebook, including statements supporting Edward Snowden and Julian Assange, are reactions of an impassioned person to the national political discourse.

The nature of the alleged offense itself also suggests no danger to national security. *See* 18 U.S.C. § 3142(g)(1). Ms. Winner "wasn't trying to be a Snowden

21

or anything." R.100, Ex. A, USAO-08162. There is no allegation that she sought

or received financial gain. The allegation is that she disclosed one document

regarding ███████████████ as a specific reaction to persistent, public

denials by the President about ████████████████████████. *See id.* at

USAO-08174 ("[T]hat info[rm]ation … had been contested back and forth back

and forth in the public domain for so long … why isn't this out there? Why can't

this be public?"). Ms. Winner's isolated alleged offense does not suggest any

ongoing danger to the community.

That is particularly so when Ms. Winner has already felt the consequences of

her alleged actions. She has been detained for more than six months. Her

indictment and detention have shattered her life and career. If released, she will

not improperly disclose information. Regardless, there is no evidence Ms. Winner

possesses any documents that could harm national security. The court made much

of Ms. Winner's insertion of a thumb drive into a secret computer, but there is no

evidence Ms. Winner downloaded any classified information. R.163 at 10, 14. If

speculation that Ms. Winner might remember classified information were enough,

then no person who once held a security clearance could ever be released pending

trial.

Finally, the district court failed to explain why Ms. Winner's proposed

conditions of release would not mitigate any purported risk. The district court's

bare assertion that the offered conditions "do not adequately protect against potential further unauthorized disclosures," R.163 at 16, does not withstand scrutiny.

## III.    Ms. Winner's Detention Is Impeding Trial Preparations

Ms. Winner has been detained for more than six months. Trial is scheduled for March 19, 2018, and Ms. Winner's detention is obstructing her consultations with counsel. Even though her attorneys possess security clearances, they cannot discuss any classified information with her in jail, and instead must do so in a SCIF, requiring complex coordination with the Government and the Bureau of Prisons. *See* R.164-1 at 3-4. This Court should order Ms. Winner's release now, before her unlawful detention impedes her defense any further.

## CONCLUSION

For the foregoing reasons, the decision below should be reversed.

Respectfully submitted,

/s/ Joe D. Whitley
Joe D. Whitley (756150)
**BAKER, DONELSON, BEARMAN,**
    **CALDWELL & BERKOWITZ, P.C.**
3414 Peachtree Road, NE, Suite 1600
Atlanta, GA 30326
(404) 577-6000
jwhitley@bakerdonelson.com

Counsel for Defendant-Appellant

23

## CERTIFICATE OF COMPLIANCE

The foregoing motion complies with the type-volume limitation of Federal Rules of Appellate Procedure 27(d)(2)(A) and 32(a)(5)(A), (6). The motion contains 5199 words, excluding those parts of the motion exempted by Eleventh Circuit Rule 26.1-3(c). This motion complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because this motion has been prepared in a proportionately spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

Respectfully submitted,

/s/ Joe D. Whitley
Joe D. Whitley
Georgia State Bar No. 756150

Counsel for Defendant-Appellant

## CERTIFICATE OF FILING AND SERVICE

Pursuant to Federal Rule of Appellate Procedure 25 and Eleventh Circuit Rule 25, I hereby certify that on December 18, 2017, I caused the foregoing motion to be filed with the Court, and to be served on counsel for the Government, by hand.

Respectfully submitted,

/s/ Joe D. Whitley
Joe D. Whitley
Georgia State Bar No. 756150

Counsel for Defendant-Appellant

ATTACHMENT

IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

UNITED STATES OF AMERICA        *
                                *
        vs.                     *        CR 117-034
                                *
REALITY LEIGH WINNER            *

## O R D E R

Pursuant to 18 U.S.C. § 3145(b), Defendant Reality Leigh Winner has filed an appeal from the United States Magistrate Judge's Detention Order of October 5, 2017.[1]  After an independent and *de novo* review of the detention proceedings before the Magistrate Judge, the arguments of counsel in brief, and the relevant law, the Court finds that detention is appropriate and therefore affirms the Detention Order.

### I.  LEGAL STANDARD

When the Government seeks to detain a defendant pending trial under the Bail Reform Act, the Court must determine whether any "condition or combination of conditions will reasonably assure the appearance of the person as required and

---

[1]    Section 3145(b) contemplates that the detained defendant will file a motion to revoke the detention order rather than an "appeal."  Because there is no substantive difference, the Court will use the term chosen by Defendant.

the safety of any other person and the community." 18 U.S.C.
§ 3142(e)(1). A hearing for that purpose will be conducted
upon motion of the Government in a case that involves "a
serious risk that such person will flee."[2] 18 U.S.C. §
3142(f)(2)(A). The Government bears the burden of
demonstrating a serious risk of flight by a preponderance of
the evidence. United States v. Medina, 775 F.2d 1398, 1402
(11th Cir. 1985).

This Court's review of the Magistrate Judge's decision is
de novo. United States v. Hurtado, 779 F.2d 1467, 1481 (11th
Cir. 1985) (stating that the district court "is not
constrained to look for abuse of discretion or to defer to the
judgment of the prior judicial officer" when reviewing
detention decisions). In assessing the Government's proof,
the Court shall consider the following relevant factors: (1)
the nature and circumstances of the offense charged; (2) the

---

[2] The Government cannot move for detention on the basis
that Defendant poses a danger to the community under 18 U.S.C.
§ 3142(f)(1) because she does not meet any of the criteria set
forth therein. United States v. Giordano, 370 F. Supp. 2d
1256, 1258-62 (S.D. Fla. 2005); accord United States v. Twine,
344 F.3d 987 (9th Cir. 2003); United States v. Byrd, 969 F.2d
106, 110 (5th Cir. 1992); United States v. Friedman, 837 F.2d
48 (2d Cir. 1988); United States v. Himler, 797 F.2d 156 (3d
Cir. 1986). Importantly, the "dangerousness" of this
Defendant is still a factor to be considered under 18 U.S.C.
§ 3142(g)(4). Giordano, 370 F. Supp. 2d at 1261 n.1.
Moreover, the "dangerousness" of Defendant as a factor also
"emanates" from § 3142(e)(1)'s requirement that the Court
consider whether any condition(s) may reasonably assure the
safety of the community. See King, 849 F.2d at 487.

2

weight of the evidence against Defendant; (3) the history and characteristics of Defendant, including character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearances at court proceedings; and (4) the nature and seriousness of the danger to any person or the community that would be posed by Defendant's release. 18 U.S.C. § 3142(g). In conducting the review, this Court may rely entirely on the pleadings and evidence developed during the Magistrate Judge's detention proceedings, or it may conclude that additional evidence is necessary and conduct its own evidentiary hearing. United States v. King, 849 F.2d 485, 490 (11th Cir. 1988). Here, the Court has determined that another hearing would not aid in this decision, particularly because the Court had the benefit of the transcripts of two prior detention hearings and the thorough and reasoned briefs of counsel. Further, no additional evidence is required, and there are no relevant factual disputes that require further evidence. Thus, Defendant's request for a hearing on this matter is denied.

3

## II.  ANALYSIS

On appeal, Defendant argues that the Magistrate Judge ignored certain favorable evidence, made findings that are unsupported by the evidence, and as a whole, improperly balanced the evidence. Consequently, the Magistrate Judge erred in finding that Defendant is a serious risk of flight. Defendant also argues that the Magistrate Judge failed to consider factors and conditions that would reasonably assure the safety of the community and her appearance at trial.

After conducting a *de novo* review of the entire record, including the transcripts of the two detention hearings, the Court finds that the Order of Detention accurately and thoroughly sets forth both the facts and the law. Despite Defendant's contentions, the Magistrate Judge properly considered the factors giving rise to detention and properly concluded that no condition or combinations of conditions would reasonably assure the safety of the community and Defendant's appearance at trial. This Court will now examine the factors set forth in the Bail Reform Act, 18 U.S.C. § 3142(g), all of which weigh against Defendant, while addressing Defendant's assertions of error on appeal.

A.   Nature and Circumstances of the Offense Charged

Defendant is charged with a violation of 18 U.S.C. § 793(e), which provides in relevant part:

4

> Whoever having unauthorized possession of,
> access to, or control over any document . . .
> related to the national defense, willfully
> communicates, delivers, transmits, or causes to be
> communicated, delivered or transmitted . . . to
> any person not entitled to receive it . . . shall
> be fined . . . or imprisoned.

The Magistrate Judge concluded that the "nature and circumstances of the offense weigh in favor of detention because of the ongoing risk to national security posed by releasing Defendant . . . ." (Detention Order, at 2.) While a violation of 18 U.S.C. § 793(e) does not create a rebuttable presumption in favor of detention,[3] the superseding indictment nevertheless charges that Defendant willfully transmitted a classified, top-secret[4] document without authority to an online news outlet, which was not entitled to receive it. (See generally Superseding Indict., Doc. 72.) A plain reading of the indictment demonstrates the serious nature of the offense. Coupled with evidence that Defendant had access to classified information during her service in the Air Force and with the NSA, particularly in light of the "covert

---

[3] Contrary to Defendant's emphasis on this point, the fact that the offense charged does not create a rebuttable presumption of detention is not determinative of this particular factor; if it was, there would be no reason to list this factor as an independent relevant consideration.

[4] A document is classified "TOP SECRET if the unauthorized disclosure of that information could be expected to cause **_exceptionally grave damage to the national security._**" (Superseding Indict., ¶ 3 (emphasis added).)

5

communications package" (discussed _infra_) that she had created around the time of taking the NSA position and her apparent antipathy toward the United States of America, the gravity of Defendant's alleged crime is unassailable. The fact that Defendant has been charged with one count-related to one transmission of one document-does not mitigate the serious nature of the offense, especially given that the matter may affect national security.[5]

B.  Weight of the Evidence

At the time of the execution of the search warrant of her home, Defendant admitted to FBI Special Agent Justin Garrick that she willfully secreted the classified document out of the NSA and mailed it to the online news outlet, which did not have authority to receive it.[6]  (Tr. of

---

[5]  Defendant harps on the fact that she has only been charged with the disclosure of "one document, one time, to one recipient, with no allegations of financial gain."  (_E.g._, Def.'s Appeal Br., Doc. 128, at 13.)  The Court finds this fact to be of little importance because it may reasonably be said that the Government caught this Defendant before any more damage could be done.  Indeed, Defendant had only recently begun her employment with the NSA contractor, Pluribus International, and had only recently researched how to disclose information to news outlets anonymously.  Also, financial gain is not the only reason a person may disclose classified information to a news outlet.  These other takes on the "only once" argument are reasonable given the evidence discussed _infra_ regarding Defendant's development of a "covert communications package," her antipathy toward America, and her research into living and working abroad.

[6]  In fact, Defendant initially denied taking any document out of the NSA building. (Tr. of Interview, at 08145-

6

Interview, Doc. 100, Ex. A, at 08161-62.) While Defendant has disputed the specific elements of this crime, particularly whether the classified document was related to the national defense[7] and whether she possessed the requisite *mens rea* to be found guilty, at this point in the proceeding, her admission to these relevant facts appear to hit upon all the elements of the crime.

Defendant complains that the Magistrate Judge did not consider that the initial statements to the FBI during the execution of the search warrant are subject to a pending motion to suppress. The motion to suppress, however, has not been fully vetted and is certainly not resolved; thus, at this point it is immaterial. Besides, in addition to the admissions to the Special Agent, Defendant has also made statements to her sister that she "screwed up" and that she "leaked a document." (Detention Hr'g Tr., Sept. 29, 2017, Doc. 109, Ex. 6.) The use of the word "leaked" indicates a

---

46.) And, when she admitted that she had printed a classified document, she initially claimed to have placed it in the burn bag and denied taking it out of the building or mailing it to anyone. (Id. at 08152-08158.) This suggests a certain level of deception.

[7] As pointed out by the Magistrate Judge, Defendant admitted that she knew the document contained information regarding sources and methods of collecting classified information that would be valuable to adversaries of the United States. (Detention Order, at 4; Tr. of Interview, at 08172.)

certain consciousness of wrongdoing because lawful possession and transmission would not be called a "leak." Moreover, as expressed by the Magistrate Judge (Detention Order, at 3), the investigatory facts which led the FBI to the independent conclusion that Defendant was the source of the leaked document will be compelling evidence against her.[8]

### C.   History and Characteristics of Defendant

The Court first notes that Defendant believes the Magistrate Judge overlooked the positive characteristics and history of Defendant, such as her honorable service to the country, her humanitarian aspirations, her strong family ties, and her lack of a criminal history. In point of fact, the Magistrate Judge opened his discussion of this factor noting: "Characteristics weighing in favor of Defendant's pretrial release are her service in the Air Force, clean criminal

---

[8]   At the detention hearing on September 29, 2017, Special Agent Garrick testified that of the six individuals that printed the subject document, only two had printed both the Intelligence Report and the attachment, both of which ended up in the possession of the online news outlet. Of the two, the investigation revealed that the document was printed by Defendant on May 9, 2017, that the document was mailed from Augusta, Georgia on May 10, 2017, and that Defendant had contacted the recipient news media outlet. (Detention Hr'g Tr., Sept. 29, 2017, at 22-24.) The investigation also revealed that on the day the classified document was printed, Defendant had researched online how to anonymously submit information to two news outlets. (Id. at 27.) After that date, Defendant performed several searches for those news outlets and information related to the potential leak of classified information to see "if leaked information had been published by those particular media outlets." (Id.)

history, and loving and committed parents." (Detention Order, at 5.) The Magistrate Judge then went on to find that negative factors outweighed the positive, pointing to her state of mind, few community ties, and past relevant conduct. Specifically, the Magistrate Judge found compelling evidence to support this finding: "Defendant admittedly 'hates' America, misused a top-secret computer during her Air Force career, admires Edward Snowden and Julian Assange, and began preparations to leak classified information from the very outset of her work as an NSA subcontractor." (Id.) Defendant takes particular umbrage at the characterization that she "hates" America and that she "admires" Edward Snowden and Julian Assange.

Upon a *de novo* review of the evidence submitted at the detention hearing of September 29, 2017, particularly the testimony of Special Agent Garrick, this Court similarly concludes that the negative implications from the evidence pertaining to Defendant's character, her mental state, her conduct in the months before her arrest, and her lack of community ties significantly outweigh the positive aspects of her family ties, commendable service in the Air Force, care for environmental issues and animals, humanitarianism, and lack of criminal record.

The Court will now recount the evidence that supports this finding:

9

- On November 9, 2016, while in the waning days of her service in the Air Force, Defendant researched whether a top secret computer will detect a thumb drive.   On this same day, Defendant inserted a thumb drive into a top secret computer for approximately two minutes.   (Detention Hr'g Tr., Sept. 29, 2017, at 48-49.)   The Government has not located the thumb drive.

- Immediately after removing the thumb drive, Defendant printed a top secret intelligence report which was "not associated in any way with [her] duties/assignments."   The Government does not know what Defendant did with the document.   (Id. at 49.)

- Defendant performed multiple searches for jobs requiring a security clearance in November 2016 at the same time that she researched for information pertaining to the Taliban and for information about an organization called Anonymous, an affiliation of hackers.   (Id. at 50-51.)

- In handwritten notes apparently regarding employment opportunities, Defendant writes "I want to burn the whitehouse down.   Find somewhere in Kurdistan to live . . . or Nepal haha maybe."   (Id. at 32, Ex. 7.)

- Included in Defendant's handwritten notes are references to Taliban military leaders.   (Id. at 37, Ex. 7.)   Defendant also performed internet searches in October, November, and December of 2016 for the Taliban media website, the Taliban office in Qatar, and the Taliban YouTube channel.   (Id. at 37-38, Ex. 8.)

- Other internet searches involve traveling, working and living in Kuridstan, Iraq, Afghanistan, Jordan and Palestinian territories, to include information pertaining to flights to Kurdistan and Erbil, moving to Palestine, and obtaining visas for Kurdistan and Afghanistan.   (Id. at 40-42, Ex. 8.)

- On February 7, 2017, two days prior to her first day of employment with the NSA contractor, Pluribus International, Defendant captured a screenshot of how to securely drop information to eight different news outlets.   The image is titled, "If you see abuse. Leak it."   (Id. at 26, Ex. 4.)

10

- On February 9, 2017, immediately after undergoing her initial security training with the NSA, Defendant sent a message to her sister, in which she said of her security training "it was hard not to laugh" when the security officer said "'yeah so uh we have guys like Edward Snowden who uhh thought they were doing the right thing, but you know, they weren't so us we uh have to keep an eye out for that insider threat, especially with contractors.'" (Id. at 42-43, Ex. 9.)

- On February 25, 2017, Defendant messaged her sister, "I have to take a polygraph where they're going to ask if I've ever plotted against the gov't. #gonnafail." She then said, "Look, I only say I hate America like 3 times a day." When Defendant's sister asked, "But you don't actually hate America, right?", Defendant responded: "I mean yeah I do it's literally the worst thing to happen on the planet. We invented capitalism the downfall of the environment." (Id. 44, Ex. 11.)

- On March 7, 2017, Defendant messaged her sister that Vault 7[9] was "so awesome" and that it had "crippled the program." When her sister asked, "So you're on Assange's side," Defendant responded, "Yes. And Snowden." (Id. at 45, Ex. 12.)

- Defendant wrote notes describing how to download and install Tor[10] on its most secure setting; researched how to swap SIM cards on her phone; researched burner email accounts (e.g., slippery.email); and wrote down the URL for a burner email account. (Id. at 32-36.)

---

[9] Vault 7 is Wikileak's alleged compromise of classified government information. (Detention Hr'g Tr., Sept. 29, 2017, at 45.)

[10] The Tor network "is a method in which someone can access the internet -- not only the internet, but also the deeper, dark web on a completely anonymous level." (Detention Hr'g Tr., Sept. 29, 2017, at 34.) The Tor network was installed on a computer in Defendant's home on February 1, 2017, several days after Defendant was hired by Pluribus International and ten days prior to her start date. (Id. at 34; Tr. of Interview, at 08144.)

11

- On the note about the burner email account, there is "specific identifying information related to foreign intelligence targets associated with terrorism activity being followed by the U.S. Government as part of its national security mission." (Id. at 39-40.)

The first point to take from this evidence is that the use of the word "hate" by the Magistrate Judge was not of his choosing, but was the word that Defendant herself used in her message to her sister. "Hate" is also an apt word to describe a person's emotion that noted she would like to burn the White House down. And while Defendant, through the testimony of her sister, would pass this off as "hyperbole" (Detention Hr'g Tr., Sept. 29, 2017, at 104), the conclusion that Defendant hates America is justifiable. Also, while Defendant offered other non-nefarious reasons that a person may research TOR, burner email accounts, and SIM cards, Special Agent Garrick testified that "taken into its totality, it appears as though it's a covert communications package or could be one. . . . [It] is a way in which an individual can communicate anonymously with another." (Id. at 36.) The credit that the Magistrate Judge and this Court give to the agent's testimony, over Defendant's proffer that there are benign reasons for each of these acts taken alone, is reasonable, especially in light of evidence that Defendant researched ways to send information to news outlets anonymously and accessed classified information outside of her job duties. In short,

Defendant attacks the Magistrate Judge's reasonable conclusions from the evidence as "sweeping" and "unsupported" (Def.'s Appeal Br. at 9), yet taking all the evidence in its totality, the Court finds the Magistrate Judge's Detention Order to be sustainable and indeed, correct in its ultimate ruling.[11]

In conclusion, the aforementioned evidence shows a person who sought out employment in a classified position with the intent to anonymously share information with news outlets and to cover her tracks while doing so. Defendant argues that she had a legitimate interest in the Middle East and religion, given her background and education. She also has strong humanitarian and environmental bents, as well as an interesting sense of humor, that can explain some of her comments. But Defendant's gloss on the evidence, painted primarily through the testimony of her sister, is but one view of the story. Certainly, the Magistrate Judge and now this Court are free to reject Defendant's gloss-the minimalization of her admitted behavior-and accept the reasonable inference

---

[11] While Defendant quibbles with the Magistrate Judge's characterization of Defendant as an admirer of Snowden and Assange, her comments to her sister endorse the conduct of these men. No matter the word choice, the point to be taken from the evidence is that Defendant condoned divulging classified information as she was "on their side." What the Magistrate Judge did not do in his Detention Order, contrary to Defendant's assertion, was equate Defendant's conduct to the "extreme conduct" of Snowden and Assange. (See Def.'s Appeal Br., at 2.)

13

from the evidence that Defendant's past conduct and state of mind are of serious concern.

    D.   <u>Nature and Seriousness of Danger Posed by Release</u>

Having found that Defendant may have accepted a position with the NSA with intentions to leak information to news outlets, it is not a leap to find Defendant's potential release troubling. The classified document she printed and the thumb drive she inserted while in the employ of the Air Force are unaccounted for. Further, while the Government has not been able to conclude that Defendant has or had in her possession other classified documents, it has not concluded that she has not had further access to classified information. (Detention Hr'g Tr., Sept. 29, 2017, at 91.) Given the uncertainty with respect to Defendant's level of knowledge or possession of classified information, together with evidence that she planned to anonymously release information to online news outlets and that she has antipathy toward the United States, the Court finds that releasing Defendant prior to trial would pose a danger to the community, particularly to the national security.

As discussed, the statutory factors for consideration each weigh in favor of the Government. Additionally, the Government has presented other significant evidence relative to Defendant's risk of flight. As mentioned, Defendant has few ties to this community, she has shown a strong intent to

14

live and work abroad, and she has demonstrated an interest in matters of the Taliban. She even researched airline flights to Kurdistan and Erbil and work visas in Afghanistan. This desire to live abroad is no doubt quickened by facing a felony charge brought by United States of America. Further, the Court finds that Defendant's fluency in Farsi, Dari, and Pashto would enable her to live and sustain herself in many Middle Eastern countries, and the $30,000 in her bank account will provide her with a start. Finally, just prior to her arrest, Defendant demonstrated her propensity for travel with a three-day solo trip to Belize. This evidence takes the chances of Defendant fleeing the jurisdiction of this Court beyond the mere theoretical and into the realm of probable. Indeed, the Court finds by a preponderance of the evidence that Defendant is a serious flight risk.

Defendant complains that the Magistrate Judge did not discuss, and therefore did not consider, whether the proposed conditions on her release would reasonably assure her appearance. The Court, however, need not enunciate every consideration in its Order. It suffices that this Court has considered the proposed conditions (for instance, the surrender of her passport, the posting of a property bond, and her agreement to wear a monitoring bracelet) and reasonably concludes that, based upon evidence that Defendant does not wish to be in America, may even wish to cause harm to national

15

security, and has the means to live abroad, Defendant will flee despite these conditions and assurances. Moreover, Defendant's promises to remain in the county, wear a monitoring bracelet, and refrain from internet usage and contact with the media[12] do not adequately protect against potential further unauthorized disclosures. Classified information cannot be retrieved or un-disclosed once it is released, so the potential of harm to national security is too great a risk to place upon the promises of this Defendant.[13]

### III. CONCLUSION

Upon a *de novo* review of the record, the Court concludes that the Magistrate Judge did not err in ordering Defendant Reality Leigh Winner detained pending trial. While Defendant urges this Court to adopt its view of the evidence, indeed painting a very different picture of Defendant, the Court cannot ignore another reasonable and supported picture of

---

[12] The Government states in a footnote that Defendant had put a member of the media on her jail visitor list and that this visitor came to see Defendant in jail on October 14, 2017. While the jail terminated the visit, this encounter took place just a few days prior to Defendant filing her appeal. (Gov't Br. in Opp'n, Doc. 131, at 18 n.7.)

[13] See King, 849 F.2d at 487 n.2 (explaining that the Senate Judiciary Committee intended a broad construction of "danger to the community" to encompass the risk that the defendant may engage in criminal activity to the detriment of the community (quoting the Report of the Senate Committee on the Judiciary, S. Rep. No. 98-225, 98th Cong., 2d Sess. (1984))).

16

Defendant. Through its considered view of the evidence, the Court finds by a preponderance of the evidence that Defendant is a serious flight risk and no condition or combination of conditions will reasonably assure the safety of the community (particularly national security) or the appearance of Defendant as required. Accordingly, the Court **DENIES** Defendant's appeal (doc. 128) and **AFFIRMS** the Magistrate Judge's Detention Order of October 5, 2017.

**ORDER ENTERED** at Augusta, Georgia, this _27th_ day of November, 2017.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

17